## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 9-53125 |
| JOEL M. KATLEMAN, | § | Chapter 11 Proceeding lmc |
| Debtor. | § | |

## MOTION OF E.F. VILLAGE FUNDING, LP TO APPOINT A CHAPTER 11 TRUSTEE PURSUANT TO UU U.S.C. SECTION 1104 OF THE BANKRUPTCY CODE OR, IN THE ALTERNATIVE, TO CONVERT CASE TO CHAPTER 7 OR DISMISS PURSUANT TO 11 U.S.C. SECTION 1112(b)

**NO HEARING WILL BE CONDUCTED HEREON UNLESS A WRITTEN REQUEST FOR HEARING IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT WITHIN TWENTY-ONE (21) DAYS FROM THE DATE HEREOF UNLESS THE COURT, UPON TIMELY APPLICATION, SHORTENS OR EXTENDS THE TIME FOR FILING SUCH REQUEST FOR HEARING. IF NO HEARING IS TIMELY REQUESTED HEREON, THE MOTION WILL BE DEEMED UNOPPOSED, AND THE COURT MAY ENTER THE ORDER GRANTING RELIEF.**

**E.F. VILLAGE FUNDING, LP ("EFVF")**, by and through counsel, file its

Motion to Appoint a Chapter 11 Trustee Pursuant to 11 USC Section 1104 and,

alternatively, to Convert to Chapter 7 or Dismissal and, in support thereof,

respectfully submits as follows:

### A. BACKGROUND

1.      JOEL M. KATLEMAN ("Katleman" or "debtor"), Debtor, originally filed

a Chapter 11 voluntary petition on August 17, 2009. Katleman currently serves as

debtor in possession and this case has not been previously converted from another

Chapter of Title 11.

2.      EFVF is the largest unsecured creditor in this bankruptcy

proceeding with an unsecured claim of not less than $8.4 million.

## B. JURISDICTION

3.     This court has jurisdiction under 28 U.S.C. Sections 157 and 1334 and venue is proper.

## C. FACTS

4.     On February 16, 2004, Golden Visions, Inc., Gary Katleman, Joel Katleman, and Joel Pollack (the "Existing Partners") entered into the Limited Partnership Agreement of Dominion Village, Ltd. ("Partnership") to develop Independence Village at the Dominion, an approximately 190-home retirement community.     Shortly after formation of the Partnership, EFVF loaned the Partnership Two Million Five Hundred Thousand 00/100 Dollars ($2.5 million) secured by a second lien on the property.

5.     After the project was started, the Existing Partners realized that they had insufficient capital to develop the project and approached EFVF about converting the existing loan into an equity position and infusing additional capital. In connection with this, Dominion Village and the partners provided certain financial information upon which EFVF detrimentally relied. On January 1, 2006, pursuant to the First Amendment to Limited Partnership Agreement effective (the "First Amendment"), EFVF's loan was converted into the "Initial EF Funding Capital Contribution," EFVF became a limited partner of the Partnership, and agreed to contribute up to an additional Six Million 00/100 Dollars ($6,000,000.00) in capital contributions to the Partnership.

6.     EFVF subsequently funded an additional $5.9 million dollars in capital contribution to the Partnership.   EFVF's $5.9 million dollar additional capital contribution and the $2.5 million dollar Initial EF Funding Capital Contribution aggregately constitute the "EF Funding Preferred Contribution" to the Partnership.   Thus, EFVF contributed $8.4 million as the EF Funding Preferred Contribution to the Partnership.   Section 19 of the First Amendment reflects the Partnership's agreement to make payments to EFVF to reduce the unreturned EF Funding Preferred Contribution ("Reduction Payments").   The Reduction Payments were scheduled by payment date and payment amount in Section 19 of the First Amendment.  Based on the financials provided on both the entity and the Existing Partners, EFVF made the investment with the express understanding that, in the event of a default – including the failure of the Partnership to pay the Preferred Return in the amount due on schedule, the Existing Partners would repurchase the EFVF's interests in the Partnership. Despite its promise, the Partnership failed to make the December 31, 2008 Reduction Payment to EFVF, which triggered the Existing Partners' obligation to repurchase EFVF's interest in the Partnership, which the Existing Partners (Debtors and Joel Pollack) failed and refused to do.

7.     Long before the Reduction Payment default, Dominion Village and the Existing Partners advised EFVF that the project was in financial difficulty. Specifically, at the end of April 2008, EFVF was notified by the one or more of the Existing Partners that there had been no sales for the previous three months and the project was unable to meet its cash needs; consequently, the project

needs to be sold or some land sold or new investors come into the deal. Contemporaneously with this revelation in early May 2008, Joel Pollack advised that Dominion Village was entertaining the sale of some or the entire project to a Mexican investor group represented by Carlos Rodriquez. On or about May 18, 2008, EFVF was notified that the Mexican investor group has decided to pass on the deal. From May 2008 forward, Dominion Village has been plagued by its poor performance and lack of cash flow. These dates are important as they relate to the timing of certain prepetition conduct by the debtor and his father.

8.     On or about September 23, 2008, Dominion Village represented to EFVF that the original business plan was no longer feasible and looked to EFVF to provide an additional $1.3M in debt service and operating reserve to ensure the projects sustainability for the next twelve (12) months. EFVF declined to make a further capital infusion. Subsequently, on September 30, 2008, Dominion Village acknowledged that there was insufficient cash to fund the EFVF preferred return and proposed an adjustment to the capital accounts to reflect this transaction to which EFVF denied consent. Dominion Village defaulted with respect to the EFVF preferred return and then, in December 2008, failed to make the Reduction Payment.

9.     On January 14, 2009, EFVF provided its "Notice of Default" letter stating that the Partnership failed to make the December 31, 2008 Reduction Payment, required to reduce the EF Funding Preferred Contribution to $7,365,158. Moreover, the January 14 letter also provided notice that if this default was not cured within ten days, then EFVF would exercise its right to

cause the Existing Partners to acquire EFVF's partnership interest. The Existing Partners failed to cure the default.

10.     On January 28, 2009, EFVF provided its "Exercise of Right to Require Existing Partners to acquire all of the Partnership Interest of EFVF" letter. This letter referenced EFVF's prior notice of the default. EFVF sent this letter because the default was not cured. Accordingly, EFVF made its written demand for the Existing Partners to acquire all of its partnership interest. Despite the proper demand, the Existing Partners failed to acquire EFVF's partnership interest. The Existing Partners' breach resulted in damages in the amount of $8.4 million (viz. the unreturned balance of the EFVF Preferred Contribution).

11.     On February 24, 2009, EFVF again provided the Existing Partners one final opportunity to resolve the dispute concerning the reacquisition of the EFVF limited partnership shares or suit would be initiated; a copy of the petition was attached thereto. The letter envisioned a definitive settlement by March 20, 2009 with closing no later than March 31, 2009. No agreement was reached.

12.     On March 27, 2009, EFVF filed suit in Bexar County District Court, Cause No. 2009-CI-05190, against, Katleman, co-debtor Joel M. Katleman, Joel Pollack, and Golden Visions, Inc., for breach of the partnership agreement (1st Amended Partnership Agreement).

13.     On July 16, 2009, EFVF filed its Motion for Summary Judgment and a hearing was set for August 17, 2009. No response to the motion for summary judgment was filed by any of the defendants, including the debtor.[1] At the summary

---

[1] At the 341 meeting, co-debtor's counsel, Mr. Ayers, further stipulated that no response to the summary judgment had been filed on behalf of the debtor.

judgment hearing on August 17, 2009, counsel for the defendants advised that Gary Katleman had filed for bankruptcy protection that morning. Before an order was entered, counsel for the defendants advised that co-debtor, Joel Katleman, had also filed for bankruptcy protection. Subsequently, an agreed judgment was entered against the two non-bankrupt co-debtors, Pollack and Golden Visions, Inc.

### D.  THE COURT SHOULD APPOINT A CHAPTER 11 TRUSTEE

14.  Once a debtor enters Chapter 11 and becomes a debtor in possession,[2] the debtor, as a "debtor in possession" is endowed with the powers, duties and *fiduciary responsibilities* of a trustee in bankruptcy. *See* 11 U.S.C. § 1107 (1988) (conferring upon the debtor in possession the power of a bankruptcy trustee). Section 1107(a) of Title 11, United States Code (the "Bankruptcy Code") provides the debtor with the opportunity to run its business and manage its affairs as a debtor in possession free from the requirement of an independent trustee appointment. *Id.* § 1107(a).

15.  The privilege and opportunity afforded the debtor and its management to continue to operate its business as a debtor in possession free from all "'self help" rights of creditors will be withdrawn by the Bankruptcy Court if the debtor is unable or refuses to abide by the provisions of the Bankruptcy Code established to protect the interests of all creditors.[3] The Bankruptcy Code

---

[2]  It is important to note that a "debtor" is not required to be a "debtor-in-possession" but must elect to serve in that capacity by not requesting a Trustee be appointed over the estate. A debtor has a right to require the appointment of a Trustee over the debtor's estate. A debtor that elects to be a "debtor-in-possession" must assume the fiduciary responsibilities of a Trustee.

[3]  It is clear that Debtors <u>must</u> comply with the Bankruptcy Rules of Procedure or risk the consequences. *See, e.g., In re Gaff, Inc.*, No. 3-83-254 (Bankr. D. Minn. March 6, 1984) (debtor consistently failed to comply with Code's reporting provisions); *In re Ford*, 36 Bankr. 501, 503-04

provides the specific mechanism for such withdrawal in Section 1104(a) of the

Bankruptcy Code which provides in pertinent part:

> "At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest, and after notice and a hearing, the court shall order the appointment of a trustee--
>> (1) *for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause,* but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;
>> (2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor." 11 U.S.C. s 1104(a) (1982); or
>> (3) if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or examiner is in the best interests of the creditors and the estate.

A trustee is appointed only at the request of a party in interest and "after notice

and a hearing." 11 U.S.C. § 1104(a) (1982). [4]   In other words, the Code provides

two justifications for appointment of a trustee. The first is an appointment for

---

(Bankr. W.D. Ky. 1983) (failure to file accurate financial statements, thereby covering up postpetition transfers of assets); *In re Vischschoonmaker, Ossendryver Galleries Int'l, Inc.,* 35 Bankr. 816, 820 (Bankr. D. Hawaii 1983) (failure to provide accounting to court); *Westinghouse Credit Corp. v. Prime, Inc., (In re Prime, Inc.),* 26 Bankr. 556, 560 (Bankr. W.D. Mo. 1983) (in view of debtor's repeated failure to observe letter and spirit of court's orders, trustee appointed to supervise debtor, and to file reports required by local rules); *In re Horn & Hardart Baking Co.,* 22 Bankr. 668, 670-71 (Bankr. E.D. Pa. 1982) (sporadic filing of monthly statements combined with continuing, unexplained losses amounted to mismanagement); *In re Caroline Desert Disco, Inc.,* 5 Bankr. 536, 537 (Bankr. C.D. Cal. 1980) (debtor's failure to comply with local rules governing controls of disbursements, reports concerning operation of business, insurance and reports to United States Trustee constituted incompetence or gross mismanagement). *See generally In re Modern Office Supply, Inc.,* 28 Bankr. 943, 944 (Bankr. W.D. Okla. 1983) (discussing the reporting duties of a debtor in possession); *In re Sea Queen Kontaratos Lines, Ltd.,* 10 Bankr. 609, 610 (Bankr. D. Me. 1981) (suggesting, in dictum, that a local rule violation is per se gross mismanagement).

[4]  The phrase 'after notice and a hearing' is defined in section 102(1)(A) to mean 'after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances . . ..' 11 U.S.C. s 102(1)(A) (1982).

cause, applying specific enumerated grounds, whereas, the second is less objective and applies a weighing of competing interests to determine the best interests of the estate and creditors.

**FOR CAUSE STANDARD**

16.    The grounds listed in section 1104(a)(1) are not exclusive. The rules of construction of the Bankruptcy Code make it clear that the words "includes" and "including" are not limiting. *See* 11 U.S.C. § 102(3) (1982). Courts reject any attempts to limit the "for cause" analysis under section 1104(a)(1) to cause "in the nature of fraud, dishonesty, incompetence or gross mismanagement." *See, e.g., In re Casco Bay Lines, Inc.,* 17 Bankr. 946, 950 n.4 (Bankr. 1st Cir. 1982). *See also In re Ford, 36 Bankr.* 501, 504 (Bankr. W.D. Ky. 1983); *In re Martin*, 26 Bankr. 39, 40 (Bankr. S.D.W. Va. 1982). And the authorities are in agreement that the time frame for the court's review of current management's actions embraces conduct both *before and after* the commencement of the case. *See, e.g., In re Anniston Food-Rite, Inc.*, 20 Bankr. 511, 515 (Bankr. N.D. Ala. 1982); *In re Curlew Valley Assocs.*, 14 Bankr. 506, 515 (Bankr. D. Utah 1981); *Dardarian v. La Sherene, Inc. (In re La Sherene, Inc.),* 3 Bankr. 169, 175 (Bankr. N.D. Ga. 1980); *see also In re Main Line Motors, Inc.*, 9 Bankr. 782, 784-85 (Bankr. E.D. Pa. 1981) ('The fact that the events preceded the bankruptcy petition is not controlling because section 1104(a)(1) embraces activities 'either before or after the commencement of the case).

17.    In fact, when flagrant violations occur, the appointment of a trustee may be mandatory. *See In re Deena Packaging Indus., Inc.*, 29 B.R. 705, 706

(Bankr. S.D.N.Y. 1983) (noting that case law interpreting § 1104(a)(1) has found where cause exists, there is no discretion and a trustee must be appointed). When a debtor flagrantly violates court orders and debtor-creditor agreements, the Court's recognize that there are few alternatives except to remove the debtor in possession. *See In re Aerosmith Denton Corp.*, 36 B.R. 116, 119 (Bankr. N.D. Tex 1983) (code's failure to specify sanctions does not mean a debtor's misuse of cash collateral should go unpunished).

### *Failure to Disclose-Fraud and Dishonesty*

18.     The debtor in possession has a duty to fully and completely disclose his transactions and the circumstances that lead to the bankruptcy filing. In this matter, debtor has failed and continues to fail to provide truthful, accurate and timely financial information.[5]   Specifically, debtor has failed to maintain and/or provide in discovery accurate financial records from which his financial affairs can be determined, debtor has failed to accurately and timely file monthly operating statements and debtor's schedules and statement of financial affairs ("SOFA") are similarly inaccurate.

19.     As to the schedules and SOFA, debtor failed to make the following disclosures and/ or provided false and misleading information:

a)   Schedule A- Real Property:  Debtor lists property located at 24611 Fairway Springs, San Antonio, TX  78260.   Under Personal Property, item 16, Accounts receivable, a contract for deed with Joel Pollack is reflected with a value of $23,000.00.  Compare this with SOFA 14- Property held for another person- None.

---

[5] See, *In re Deeana Packaging Indus., Inc.*, 29 BR 705, 707-8 (BK SDNY 1983)

Debtor alleges that the Fairway Springs property has been sold under a contract for deed to one of the Existing Partners, Joel Pollack. No written contract for deed or other instrument of conveyance by contract has been produced. Instead, the records reflect that Debtor is the record title owner and there is a mortgage against the property in Debtor's name. Debtor made the down payment for this property and alleges that Pollack is making minimal monthly payments to reimburse Debtor for the down payment, based on certain intercompany ledger entries, and that Pollack is paying the mortgage on Debtor's behalf. The only records produced are an intercompany ledger reflecting an @$200 month credit to Debtor. This property has a tax value in excess of $300,000.00 with a mortgage balance of @$230,000.

b) i) Schedule A Real Property- except for the property referenced in a) above, none is listed; however, in Debtor's Schedule J, line item 13.b. Home Owner's Assn. dues in the amount of $16.00/month and property taxes of $403.00/month are listed in debtor's monthly expenses. These expenses appear to relate to a residence located at 2101 Cerrado Brio, Tuscon, AZ. This property was purchased by debtor in October 1998 and owned by debtor and his spouse, Marilyn Soper aka Marilyn Ruck, as joint tenants. On October 17, 2008, debtor unilaterally and without consideration, by way of a disclaimer of interest and warranty deed conveyed his undivided ½ interest in this property to his spouse Marilyn Soper. This property has a value in excess of $600,000.00 (50%-$300,000). Although within one year of the date of filing, this transaction was neither listed as a gift (SOFA #7) nor Other Transfers (SOFA #10). This property

is believed to be owned free and clear of any mortgage debt, was not listed as exempt, and the transfer was outside the ordinary course of business or financial affairs of Debtor and occurred within two years of the bankruptcy filing.

b)ii) Schedule Real Property- except for the property referenced in a) above, none is listed.  Similarly, no other property is listed as a gift  (SOFA #7) or Other Transfers (SOFA #10).   Debtor failed to disclose his prior ownership interest in a residence located at 4770 Via Sonrisa, Tuscon, AZ.   Debtor purchased this property in May 2006, and then created a joint tenancy ownership with his daughter, Jennifer Katleman.  On or about February 2, 2009, Debtor, unilaterally and without consideration, by way of a quitclaim deed conveyed his undivided ½ interest in this property to his daughter.  This property has a value in excess of $400,000.00 (50%- $200,000) based on the purchase price and tax records of Pima County, AZ.  This conveyance was outside the ordinary course of business or financial affairs of Debtor and occurred within two years of the bankruptcy filing.

c) Undervalued Income- Debtor significantly undervalued his income from employment or the operation of a business, all of which was allegedly derived from Dial Communities, inc.

| Year | Amt. Disclosed | Amt. per Tax Return |
|------|----------------|---------------------|
| 2009 | $8,800 (to date of filing) | $52,438.00 as of 10/30/09 |
| 2008 | $13,200 | $52,209.20 |
| 2007 | $13,200 | $69.709.28 |

d) Other Income not disclosed- Income other than from employment or operation of a business (Item #2-SOFA). Debtor has failed to accurately disclose the source and amounts of income. In particular, debtor references payments from a family limited partnership when, in fact, no such payments occurred. There is no record of any of these payments coming to the debtor from the Joel M. Katleman Family L.P. There was payment in November 2008 from the Katleman Irrevocable Trust that bypassed the family limited partnership and went directly to the Debtor. The transactions involving the irrevocable trust and family limited partnership will be discussed later in more detail.

e) Other undisclosed transfers. Debtor made several other significant undisclosed transfers within one year of filing that were discovered after many months delay as well as a motion to compel to procure the requested document production. These will be addressed in descending order of priority:

e)i) Transfers to spouse, Marilyn Soper. In March 2009, Debtor's wife, Marilyn Soper, created a new separate property account and the following sums were transferred into this account from Debtor's account with the same financial institution.

a) March 17, 2009   - $50,000.00[6]

b) March 24, 2009   -$130,0000.00

c) January 21, 2010 -$29,549.00[7]

---

[6] These transfers were made contemporaneously with EFVF's demand for payment and threatened suit. Suit was filed on March 27, 2009.

[7] This amount was transferred post-petition and was not reflected in any of the debtor's monthly operating report and was only discovered on receipt of Soper's partial bank records in mid-February 2010.

ii)     Debtor failed to disclose a payment to Phil Wayne in the amount of $28,170.00 that cleared May 22, 2009. The actual check references repayment of a loan, however, Debtor has alleged that the check was partially a gift of $9,700 and partially for payment on a lengthy undisclosed, post-petition vacation to Australia and New Zealand in October 2009. In October 2009, Debtor requested additional time to gather information for discovery which was agreed to. However, upon production of the documents it was later discovered that the basis for the delay was not to procure documents but to permit debtor and spouse to participate in a $20,000+ family vacation. At the time of discovery it was too late to try to recover any pre-petition payments for this expensive vacation.

iii)  Debtor also failed to disclose a payment of $5,000 on July 3, 2009 to his daughter, Jennifer Katleman; and

iv) Lastly, there are two unknown post-petition payments that cannot be discerned from debtor's financial records or the monthly operating reports:

        A) payment of $10,000 on August 28, 2009 and

        B) payment of $29,390 on September 8, 2009.

20.     Inaccurate operating reports- Debtor's monthly operating reports are generally untimely, inaccurate and do not reflect his ongoing financial affairs. For example, debtor's operating report reflects monthly income of @ $3.500/mo; however, debtor's cash reserves have increased to over $100,000.00. What is the basis for this increase in cash reserves and why is it not income? Requests have been made to debtor for an explanation but, to date, none has been

forthcoming. Debtor has filed the first three reports late and, to date, the January 2010 report has not been filed.

### *Fraudulent Transfers*

21. At the 341meeting, debtor testified that as part of an eleven-year estate plan, he had established a mechanism to minimize his estate taxes. Contrary to debtor's representations, however, there was no eleven year estate plan but, instead, a blatant attempt to put his assets beyond the reach of his creditors in late May 2008. The timing of these transactions is important because the "estate planning" was contemporaneous with debtor's acknowledgement of the financial straits affecting Dominion Village and its inability to meet debt payments which, upon default, would result in debtor being called upon to buy back the interests of EFVF.

22. Debtor's estate plan consisted of the sale of substantially all of his assets to a self-settled irrevocable trust in exchange for a self-cancelling note in the amount of $6.5 million.[8] The note was secured by the interests transferred. Debtor next created a family limited partnership and assigned the note and security interest to the limited partnership. Debtor is alleged to be the owner of the family limited partnership. At the time of the purported transfer of assets, Debtor had previously valued the transferred assets at @$9 million; consequently, Debtor did not receive reasonably equivalent value for the transferred assets and effectively rendered himself insolvent.

23. In addition, there are multiple irregularities with respect to the note and security agreement as well as a failure to adhere to the "corporate"

---

[8] In contrast, Debtor's March 25, 2009 financial statement valued this note at only $1.5million.

formalities of the structure of the estate plan.  In particular, all of the disclosed payments from the trust to debtor bypassed the family limited partnership and were made payable to him and deposited into his account. Debtor's son and co-debtor in Case No. 09-53118, Gary Katleman, is the trustee as well as manager of the limited partnership and is the signatory on many of the suspect transactions.

24.    Debtor did not engage in legitimate pre-bankruptcy estate planning but, instead, used the estate plan as a subterfuge to attempt to defraud and/or place his assets beyond the reach of his creditors.  Section 548 of the code has two provisions that affect avoidance actions, 548a)1) provides that a transaction may be set aside if made within two years from the date of filing while 548e)1) provides for a ten-year (10) look back when the transfer is to a self-settled trust. Under 548 a) 1)A) a transfer may be set aside if it was made with actual intent to hinder, delay or defraud whereas under 548a)1)B) requires no showing of actual intent but a showing of less than equivalent value and insolvency as a result of the transfer.  Section 548e)1) additionally provides that a transfer may be set aside if the debtor made the transfer to a self-settled trust, the ebtor is a beneficiary of the trust, and the transfer was made with intent to hinder, delay or defraud  a creditor which the debtor was or became indebted.  Similarly, under Texas law, Section 24.000 et seq. of the Tex. Bus. & Com. Code aka Texas Fraudulent Conveyance Act, there is a four-year timeframe to set aside transfers under traditional fraudulent conveyance concepts.   Under either of these statutes, Movant submits that the "estate plan" as well as several other transfers

should be set aside as a fraudulent conveyance and the transfers brought back into the bankruptcy estate. The problem with this strategy, however, consists of an inherent and irreconcilable conflict of interest with the debtor in possession, which will be addressed later.

25.     In addition to the alleged "estate plan", Debtor also attempted to put other assets outside the reach of his creditors, specifically, three parcels of real property referenced in paragraph 19 above (two Arizona and one San Antonio property). Movant submits that the purported transfers constitute fraudulent conveyances should be set side and brought back into the estate for the benefit of the creditors.

### *Alleged Gambling Losses*

26.     At the same time as EFVF was filing suit[9], and in lieu of making any payments to EFVF, Debtor elected to channel @$350,000.00 to Las Vegas casinos. It has been difficult to reconstruct debtor's alleged gambling transactions but utilizing the records produced by the casino's and debtor's bank, the following transactions are reflected:

> a)  2/27/09 -3 checks in the amount of $9,000 each
> b)  3/17/09 – Bellagio wire transfer $100,000
> c)  3/18/09 -  Bellagio wire transfer $50,000
> d)  3/19/09 – Caesars wire transfer $50,000
> e)  3/25/09 – unknown wire transfer $45,000
> f)  3/27/09 – unknown wire transfer $10,000
> g)  6/9/09 – Caesars wire transfer $50,000
> h)  8/17/09 – incoming wire transfer and credit $50,000

---

[9] EFVF subpoenaed the records from @ 20 casinos, some of which resulted in information on the Katlemans and some not. The transactions referenced above occurred primarily at the Bellagio and Caesars between 3/17-27/09. At the same time as these transfers were being made by debtor, his son, Gary Katleman, moved another @$550,000 into the Vegas casinos.

[checks and wire transfers located total @$332,000 less $50,000 credit] [10]

27.     What happened to these funds is the question.  According to the casino records, debtor had no prior history of significant gambling activity or of being a "high stakes" player.  The available casino records reflect nominal betting and no significant losses, all recorded losses being in the $500-2,000 range. Because of the amount of money being transferred and the size of the bets being placed, one casino was suspicious of debtor's activity because he was not playing at a level commensurate with the size of the funds on hand.  There was also one instance where debtor and his son converted chips from one casino (Caesar's) into cash or chips at another (Rio) and where funds were converted into Canadian dollars.  Debtor's explanation is that he was a high stakes poker player and the money was lost playing poker.  Alternatively and, under the circumstances more plausible, is that Debtor never lost the money and the funds remain in cash or chips.

### Gross Mismanagement and Incompetence

28.     At the time EFVF was induced to lend money and become a limited partner in Dominion Village, the Existing Partners represented that the total cost of Phase I construction, including the entire project land cost and 50 unit build out, would be in the neighborhood of $23 million.  To date, of the 50 proposed units only 34 are constructed, the clubhouse remains unfinished, the actual

---

[10] SOFA Item 8, debtor references $350,000 in "gambling losses."

construction costs for this phase of the project exceed the budget by almost $10 million.[11]

29.    The project has been on a precarious financial footing since early 2008 and is not getting better. There have been no sales in the past year, cash flow from the project is insufficient to meet the ongoing operating expenses as well as debt service, membership funds were not escrowed and have been spent leaving a $5.4 million dollar contingent liability, there are no funds to complete the project, and co-debtor, Gary Katleman, has sought approval from the bankruptcy court to fund the next quarterly interest payment to the secured lender. Movant submits three is no reasonable likelihood of any recovery and foreclosure may be imminent.

30.    During the financial meltdown of Dominion Village, the Existing Partners refused and continue to refuse to keep EFVF reasonably informed of its deteriorating financial condition. Moreover, when the Existing Partners had an opportunity to make a cash infusion to help salvage the project and apply the funds to debt service of Falcon and EFV, two of the three partners elected to allegedly "gamble" away $900,000.00 in Vegas. Both of these partners (debtors) were personally liable to EFVF through the First Amended Limited Partnership Agreement and are guarantors of the Falcon mortgage. Current management (the Existing Partners) has grossly mismanaged this project both before and after the commencement of the bankruptcy case.

---

[11] SDD, a wholly owned entity of the Existing Partners was the construction company on this project. On information and belief, the total debt against the partnership exceeds $32 million.

31.     Debtor and his co-debtor son, Gary Katleman, own and operate multiple limited partnerships, corporations, trusts and other entities. All of these entities are interlocking in nature and it appears that the Katleman's have the ability to withdraw and/or divert funds from one operation to another or themselves with little or no accountability.     These entities are inextricably intertwined with one another that, on information and belief, have resulted in alleged intercompany loans, the commingling of funds as well as the use of entity funds for personal use. Given debtor's pre- and postpetition conduct, Movant submits that Debtor lacks the managerial and organizational credibility to reorganize.

### *Discovery Abuse*

32.     EFVF has been very generous in granting time extensions or whatever was necessary to procure documents from Debtor, his spouse, and their myriad companies, trusts and partnerships.     In connection with the first discovery request, however, Debtor represented that he needed additional time to procure the documents from the bank when, in fact, Debtor was in Australia/New Zealand on a family vacation. Notwithstanding the additional time granted, Debtor's document production has been plagued by an inability to produce documents in readable format, produced documents are incomplete, or simply not produced making it impossible for EFVF to determine the nature and extent of Debtor's financial affairs.

33.     EFVF was ultimately required to seek compliance in a motion to compel; however, Debtor has still failed to comply with production of documents

under the agreed court order compelling same, e.g. a list of the assets and liabilities of Debtor's spouse, Marilyn Soper (aka Marilyn Ruck) has not been produced. This information is important because of the undisclosed pre- and postpetition transfers of real property and funds to her. Debtor's misrepresentations, delay and wholesale lack of candor are indicative of a lack of respect for the process and unnecessarily burdened this creditor with additional fees and expenses.

**Conflict of Interest**

34.     As a debtor in possession in Chapter 11, all of the avoidance powers of a trustee reside in the debtor.   Movant submits there are inherent and irreconcilable conflict of interest that precludes this Debtor from investigating and moving to set aside and recovering the referenced pre- and postpetition transfers for the benefit of the estate.   Debtor has been requested to set aside these transactions, including unwinding his alleged "estate plan;" however, Debtor has failed to initiate any such actions.   Since Debtor is unable to make impartial investigations and decisions demanded in evaluating and prosecuting these transactions, a trustee should be appointed. See, e.g., *In re L. S. Good & Co.,* 8 Bankr. 312, 315 (Bankr. N.D.W. Va. 1980).

**BEST INTERESTS OF ESTATE AND CREDITORS**

35.     The second express ground for the appointment of a Trustee is if such appointment is in the best interests of the estate and creditors.   There is little guidance from the language of the statute or its legislative history; however, the current consensus of opinion is that the court is called upon to weigh the

interests of all of the relevant constituencies in the case, not just the creditors. In this case, however, there are really no constituencies other than EFVF as it comprises almost 100% of the debt and there are no equity holders.

36.     In weighing the interests, courts have considered factors such as the trustworthiness of the Debtor, his past and present performance and prospect for rehabilitation, and the confidence of the creditors in current management. As demonstrated in the "for cause" section, there are serious concerns both about Debtor's trustworthiness a well as his prospects for rehabilitation.     Given his failure to take any action to date, it is apparent that Debtor's inherent conflict of interest is interfering with his fiduciary duty to the estate and has precluded him from setting aside the multiple pre-and postpetition transfers.     Under these circumstances, there has been a wholesale failure to instill confidence in the debtor's abilities and appointment of a trustee would be in the best interests of estate and creditors.

### Conclusion

37.     Based on the foregoing, EFVF submits that appointment of a Trustee is warranted under either the "good cause" or "best interests" tests.

### E. IN THE ALTERNATIVE, THE COURT SHOULD CONVERT THIS CASE TO CHAPTER 7 OR DISMISS

38.     A party in interest may file a motion to dismiss or convert a Chapter 11 case to a Chapter 7 case for cause. Section 1112(b)(1) of the Bankruptcy Code states that:

> "Except as provided in paragraph (2) of this subsection, subsection (c) of this section and section 1104 (a)(3), on request of a party in

interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes *cause*."

Once cause for such relief is shown, the court has broad discretion to either convert or dismiss the Chapter 11 case.[12]

39.     Although the list is not all-inclusive,[13] Code § 1112(b)(4) provides that "cause" includes 16 grounds for conversion or dismissal including the following factors applicable in this case:

a) substantial or continuing loss or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

b) gross mismanagement of the estate;

d) unauthorized use of cash collateral substantially harmful to 1 or more creditors;

e) unexcused failure to satisfy timely any filing or reporting requirements established by this title or by any rule applicable to a case under this chapter.

40.     The reasoning and evidence submitted in connection with the appointment of a Trustee also support conversion of his case to Chapter 7 and/or dismissal.

41.     Movant further submits that Debtor has no reasonable likelihood of

---

[12] 11 U.S.C.A. § 1112(b)(1) ("whichever is in the best interests of creditors and the estate"). See, e.g., *In re Klenosky*, 130 B.R. 132 (E.D. N.Y. 1991) (court has power to convert Chapter 11 case when party in interest has only moved to dismiss); *In re Express Freight Lines, Inc.*, 119 B.R. 1006 (Bankr. E.D. Wis. 1990) (where there are substantial assets that may be consumed unless trustee is appointed, conversion, rather than dismissal, is appropriate).
[13] See 11 U.S.C.A. § 102(3).

rehabilitation and no ability to confirm a plan.  Movant reserves the right to amend or supplement this motion depending on the outcome of scheduled hearings regarding further funding of the Falcon debt and filing of a Chapter 11 plan on March 31, 2010.

42.     Furthermore, in a conversion, an independent trustee would pursue preference claims and fraudulent transfers that Debtor's conflicted interests would keep him from pursuing.  Pursuing such actions would be in the best interests of creditors and the estate and should be taken into account when deciding on this motion pursuant to § 1112(b) and 1104(a).

43.     The court has broad discretion to either dismiss or convert a Chapter 11 case and may consider other grounds as they arise after notice and hearing, Section 1112(b) mandates that the court may use its equitable powers to reach an appropriate result.  Once "cause" is established, however, court must convert or dismiss the case (whichever is in the best interests of creditors and the estate) unless it specifically finds and enumerates that the requested conversion or dismissal is not in the best interest of creditors and the estate. 11 U.S.C. § 1112(b)(1).


44.     Movant submits that, in the event the court declines to appoint a Chapter 11 trustee, the evidence before the court should call for dismissal or conversion of the case.


<u>E.  CONCLUSION</u>

Section 1104(a)(1) states that the court shall order the appointment of a case trustee "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either *before or after* the commencement of the case..." Section 1104(a)(2) provides that the court shall appoint a trustee if such appointment "is in the interests of creditors, any equity security holders, and other interests of the estate ... ." Requisite "cause" has been shown to appoint a trustee because of the gross mismanagement, non-disclosures, and the need of an independent trustee to pursue avoidance actions that would benefit the estate and be in the best interests of the estate and creditors. Alternatively, Movant submits that conversion or dismissal of the case would be similarly justified and appropriate

## F. RELIEF

For the foregoing reasons, Movant respectfully requests that this Court appoint a Chapter 11 trustee or, alternatively, convert this to a case under Chapter 7 of the Bankruptcy Code pursuant to Section 1112(b) of the Bankruptcy Code or dismiss the case.

Respectfully submitted this 24th day of March 2010.

*(s) Thomas W. McKenzie*
THOMAS McKENZIE
State Bar No. 13708700
Law Offices of
Thomas W. McKenzie
10107 McAllister Freeway
San Antonio, Texas 78216
(210) 227-2698
(210) 227-9334 – FAX

and

Derick J. Rodgers
Davis, Cedillo & Mendoza, Inc.
McCombs Plaza, Suite 500
755 E. Mulberry
San Antonio, TX 78212
210.822.6666
210.822.1151
Email: drodgers@lawdcm.com
ATTORNEYS FOR EF VILLAGE
FUNDING LP

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *Motion to Appoint Chapter 11 Trustee– Debtor, Joel M. Katleman* in accordance with the courts ECF policy and to any non-subscribers to ECF by mailing same, U.S. First Class Mail on the 24th day of March 2010

R. Glen Ayers
Langley & Banack, Inc.
Trinity Plaza II
745 E, Mulberry, Suite 900
San Antonio, TX 78212

Richard E. Haynes
Trevino, Valls & Haynes LLP
6909 Springfield Ave., Suite 200
Laredo, TX 78041

U.S. Trustee
Box 1539
San Antonio, Texas 78295-1539

William B. Kingman
4040 Broadway
San Antonio, TX 78209

Matthew W. Migliore
Linebarger
711 Navarro St., #300
San Antonio, TX 78205

*(s) Thomas W. McKenzie*
Thomas W. McKenzie